

**FILED**

Jan 29 2016, 8:50 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

Megan Shipley
Marion County Public Defender Agency
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Larry D. Allen
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Willie Moore,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff.* | January 29, 2016<br><br>Court of Appeals Case No.<br>49A02-1505-CR-321<br><br>Appeal from the Marion Superior Court<br><br>The Honorable Peggy Hart, Commissioner<br><br>Trial Court Cause No.<br>49G20-1407-F5-35217 |

**Pyle, Judge.**

# Statement of the Case

Appellant/Defendant, Willie Moore ("Moore"), appeals his convictions for Level 6 felony resisting law enforcement[1] and Level 4 felony unlawful possession of a firearm by a serious violent felon.[2] Moore, a former resident of the Coppertree Apartment Complex ("Coppertree"), was stopped by Coppertree's courtesy police officer one day. The officer discovered Moore's name after stopping him and believed that he was a former resident who was on the complex's trespass list. As a result, he requested to pat Moore down, but Moore ran. When the officer caught Moore, he arrested him, searched him, and discovered a firearm in Moore's possession. Moore was subsequently convicted of: (1) resisting law enforcement as a Level 6 felony because the officer had been injured while pursuing Moore; and (2) possession of a firearm as a serious violent felon because Moore had a prior out-of-state conviction for residential burglary, which the trial court concluded was substantially similar to Indiana's statute for burglary.

On appeal, Moore argues that: (1) the trial court abused its discretion in admitting evidence of the firearm because he was unlawfully stopped by Coppertree's officer and, therefore, the resulting arrest and search violated his right to privacy under the United States and Indiana Constitutions; (2) the trial court erred in convicting him of possession of a firearm as a serious violent

---

[1] IND. CODE § 35-44.1-3-1(a)(3).

[2] I.C. § 35-47-4-5(c).

felon because his prior out-of-state conviction for residential burglary was not substantially similar to a conviction for burglary in Indiana; and (3) there was insufficient evidence to support his conviction for resisting law enforcement as a Level 6 felony because there was no evidence that he caused the injuries Coppertree's officer suffered while pursuing him. We conclude that: (1) the officer had reasonable suspicion to stop Moore, so the stop was lawful under the United States Constitution; (2) the officer's actions were reasonable under the totality of the circumstances, so the stop was lawful under the Indiana Constitution; and (3) the Illinois statute for residential burglary was substantially similar to the Indiana statute for burglary. However, we agree with Moore that there was not sufficient evidence to elevate his resisting law enforcement conviction to a Level 6 felony because there was no evidence that he proximately caused the officer's injuries. As a result, we affirm Moore's conviction for unlawful possession of a firearm by a serious violent felon, but we reverse his conviction for resisting law enforcement as a Level 6 felony. We remand to the trial court with instructions to vacate Moore's resisting law enforcement conviction and to enter a new conviction and sentence for the lesser-included offense of Class A misdemeanor resisting law enforcement.

[3] We affirm in part, reverse in part, and remand.

## Issues

1. Whether the trial court abused its discretion in admitting the handgun.

2. Whether the trial court erred in determining that the Illinois residential burglary statute was substantially similar to the Indiana burglary statute.

3. Whether there was sufficient evidence to support Moore's conviction for resisting law enforcement as a Level 6 felony.

## Facts

Officer Christopher Helmer ("Officer Helmer"), a patrolman with the Speedway Police Department, worked as a "courtesy officer" for Coppertree when he was not working as a patrolman with the police department. (Tr. 4). As a courtesy officer, he was responsible for Coppertree's security and responding to service calls. On July 12, 2014, Officer Helmer was at Coppertree when he saw Moore and another male walking along the street next to the complex. He stopped his patrol car next to them and got out to question them because he found it suspicious that Moore was wearing a dark hoodie when it was "roughly eighty" degrees outside that day. (Tr. 6). He also could not remember ever having seen the two males before. When he stopped, he did not activate his patrol car's lights or siren or ask either man to stop. Nevertheless, the men stopped to talk to him.

Officer Helmer asked whether the men lived in Coppertree. Moore told him that they did not, but he gave Officer Helmer his name, which the officer recognized. Officer Helmer knew that Coppertree "had had several complaints about Willie Moore," and another officer at Coppertree had told Officer Helmer that he had issued a written trespass warning to a Willie Moore. (Tr.

10).  Officer Helmer also knew that Moore had previously lived at Coppertree but that his family had been evicted.

[6]     While he was talking to the officer, Moore put his hands in his pocket.  Out of concern for his safety, Officer Helmer asked both men if he could pat them down.  Moore's companion complied with Officer Helmer's request and put his hands up so that the officer could pat him down.  However, as Officer Helmer began to pat his companion down, Moore said, "Man, lets' get out of here," and started walking backwards away from the officer.  (Tr. 10).  Officer Helmer told him to stop, but, instead, Moore turned around and ran.

[7]     Officer Helmer radioed to dispatch that he was engaged in a foot pursuit and pursued Moore.  Two blocks into this pursuit, he fell down as he ran and suffered a partially-torn tendon in his left shoulder.  Still, he followed Moore into one of the buildings on the complex and found him trying to get into an apartment in that building.  He deployed his taser, gained control over Moore, and then radioed for backup.  When additional police officers arrived, Officer Helmer placed Moore in handcuffs and searched him.  As a result of this search, he found a loaded firearm in a firearm holster in Moore's pant leg.

[8]     Subsequently, on July 15, 2014, the State charged Moore with Level 5 felony possession of an altered handgun and Level 6 felony resisting law enforcement.  On August 15, 2014, the State added an additional count charging Moore with Level 4 felony unlawful possession of a firearm by a serious violent felon.  The State's basis for this charge was that in 2013 Moore had been convicted of

residential burglary in Cook County, Illinois. The State believed that the statutory elements of residential burglary in Illinois were substantially similar to the statutory elements of burglary, a serious violent felony, in Indiana.

[9] Prior to trial, Moore moved to suppress evidence of "any items seized, or statements made by [Moore,]" during Officer Helmer's investigatory stop. (App. 52). He argued that Officer Helmer had stopped him without a warrant, did not have probable cause to arrest him, and did not have reasonable suspicion of criminal activity. He asserted that, absent those constitutional requirements, the stop violated his right to privacy under the United States and Indiana Constitutions, and that all of the evidence gained as a result of the stop was therefore inadmissible. The trial court took the motion under advisement and held a bench trial on the charges on January 29, 2015.

[10] At the trial, Officer Helmer testified that, when he stopped Moore, he had known that two men named Willie Moore had lived at Coppertree—Moore and Moore's father, Willie Moore, Sr. Officer Helmer knew that Willie Moore, Sr., had held the lease at Coppertree, but that the residents' complaints had concerned Willie Moore, Jr. He testified that when he had stopped Moore, he had not known Moore and Moore, Sr.'s respective ages, weights, or heights. However, he said that he had previously heard Moore described as "a younger in the early 20's black male." (Tr. 23). Based on this description, he said that he had believed that the Willie Moore he had stopped on July 12 was Willie Moore, Jr., the subject of the complaints Coppertree had received.

[11] Also at trial, Moore testified and stipulated to the fact that he had been convicted of residential burglary in Chicago, Illinois on December 5, 2013. He also acknowledged that he had been on probation for that conviction when he committed his offenses in the current case.

[12] At the conclusion of the presentation of evidence, the trial court took the matter under advisement. It then held a hearing on March 16, 2015, at which it denied Moore's motion to suppress. At the same hearing, the court rendered its verdict that Moore was guilty as charged. However, the court found that Moore's charge for possession of an altered handgun was a lesser-included charge of unlawful possession of a firearm by a serious violent felon, and the court did not enter a judgment of conviction for Moore's possession of an altered handgun.

[13] Thereafter, on April 22, 2015, the trial court held a sentencing hearing. It sentenced Moore to one (1) year for his resisting law enforcement conviction and five (5) years for his unlawful possession of a firearm by a serious violent felon conviction, with the sentences to be served concurrently. The court found that Moore's age—twenty-one—was a mitigating factor and that his history of delinquency and the fact that he was on probation at the time of his offenses were aggravating factors. Moore now appeals.

# Decision

[14] On appeal, Moore raises three issues: (1) whether the trial court abused its discretion in admitting evidence of the handgun; (2) whether the trial court

erred in determining that the Illinois residential burglary statute was substantially similar to the Indiana burglary statute; and (3) whether there was sufficient evidence to support his conviction for resisting law enforcement as a Level 6 felony. We will address each of these issues in turn.

### 1. Admission of Evidence

Moore's first argument is that the trial court abused its discretion when it admitted evidence of the handgun that Officer Helmer found when he searched him. We review a trial court's ruling on the admissibility of evidence for an abuse of discretion. *Garcia v. State*, 25 N.E.3d 786, 788 (Ind. Ct. App. 2015). We will only reverse when admission is clearly against the logic and effect of the facts and circumstances before the court and the error affects a party's substantial rights. *Id.* In making this determination, "[w]e consider the evidence most favorable to the trial court's decision and any uncontradicted evidence to the contrary." *Id.* When an appellant's challenge to the admission of evidence is based on the argument that the search or seizure of the evidence was unconstitutional, it raises a question of law, which we review de novo. *Id.*

Moore asserts that Officer Helmer's stop was unlawful and, accordingly, the handgun was inadmissible under the fruit of the poisonous tree doctrine. Moore raises this argument under both the United States and Indiana Constitutions. Because our analysis is different under each constitution, we will consider his federal and state arguments separately.

## A. Fourth Amendment

The Fourth Amendment to the United States Constitution protects persons from unreasonable search and seizure by prohibiting, as a general rule, searches and seizures conducted without a warrant supported by probable cause. *Clark v. State*, 994 N.E.2d 252, 260 (Ind. 2013). As a deterrent mechanism, evidence obtained in violation of this rule is generally not admissible in a prosecution against the victim of the unlawful search or seizure under the fruit of the poisonous tree doctrine, absent evidence of a recognized exception. *Id.*

A person has been "seized" for purposes of the Fourth Amendment when an officer has, by means of physical force or a show of authority, restrained the liberty of a citizen, or when, in view of all of the circumstances surrounding the incident, a reasonable person would have believed he was not free to leave a police officer's questioning. *D.Y. v.* State, 28 N.E.3d 249, 255 (Ind. Ct. App. 2015). However, an officer may, without a warrant or probable cause, briefly detain an individual for investigatory purposes if the officer has reasonable suspicion that criminal activity "'may be afoot.'" *Edmond v. State*, 951 N.E. 2d 585, 588 (Ind. Ct. App. 2011) (quoting *Terry v. Ohio*, 392 U.S. 1, 27 (1968)). Accordingly, limited investigatory stops and seizures on the street involving a brief question or two and a possible frisk for a weapon can be justified by mere reasonable suspicion. *Id.* The reasonable suspicion inquiry is highly fact-sensitive and is reviewed under a sufficiency of the evidence standard. *Finger v. State*, 799 N.E.2d 528, 533 (Ind. 2003). We do not reweigh the evidence, and we consider conflicting evidence in the light most favorable to the trial court's

ruling. *Id.* Reasonable suspicion must be based on specific and articulable facts known to the officer at the time of the stop that lead the officer to believe that "'criminal activity may be afoot.'" *Id.* at 533-34 (quoting *Terry*, 392 U.S. at 30). This standard requires more than mere hunches or unparticularized suspicions. *Id.* at 534.

[19] Here, Moore argues that Officer Helmer did not have reasonable suspicion to detain him. He admits that Officer Helmer did not need reasonable suspicion to stop him initially because it was a consensual conversation in a public place, *see State v. Calmes*, 894 N.E.2d 199, 202 (Ind. Ct. App. 2008) (stating that a consensual encounter in which a police officer makes a casual and brief inquiry of a citizen that does not involve an arrest or stop does not implicate the Fourth Amendment), but he contends that when he decided to end his initial conversation with Officer Helmer by leaving the pat down, the officer did not have reasonable suspicion to stop him from leaving. The trial court found that the Officer did have reasonable suspicion because Officer Helmer had discovered Moore's name, knew that several residents had complained about a Willie Moore, and knew that a Willie Moore had been placed on the trespass list. Moore disputes this finding, arguing that: (1) the complaints were equivalent to anonymous tips, and Indiana courts have held that an anonymous tip is not sufficient to create reasonable suspicion; and (2) Officer Helmer did not know the age, height, or weight of the Willie Moore that had been placed on the trespass list and, therefore, could not reasonably have believed that the

Willie Moore on the trespass list was him. In support of this second argument, he notes that his father, Willie Moore, Sr., had also lived in the complex.

[20] Contrary to Moore's argument regarding the residents' complaints, it is well-established in Indiana that a tip from a concerned citizen may justify an investigatory stop if sufficiently reliable. *Russell v. State*, 993 N.E.2d 1176, 1180 (Ind. Ct. App. 2013). The reliability of a concerned citizen tip "'generally must be established by reference to underlying facts and circumstances which indicate that the information is trustworthy.'" *Id.* (quoting *State v. Renzulli*, 958 N.E.2d 1143, 1147 (Ind. 2011)).

[21] However, we need not consider whether the residents' complaints were reliable because we conclude that, once Officer Helmer discovered Moore's name, he had reasonable suspicion to stop Moore to determine whether he was the same Willie Moore whom Officer Helmer had heard was on the trespass list. Officer Helmer was only required to have a "reasonable suspicion" to stop Moore, not "absolute certainty" that Moore was involved in illegal activity. *See Rutledge v. State*, 28 N.E.3d 281, 290 (Ind. Ct. App. 2015) (stating that "*Terry* does not require absolute certainty of illegal activity"). At trial, Officer Helmer established that he knew two Willie Moores had lived at the apartment complex, one of whom was on the trespass list. Even if, as Moore argues, Officer Helmer did not know the heights and ages of the respective Willie Moores, he still knew there was a substantial likelihood, based on the name, that the person he had stopped was the person on the trespass list. Further, there is evidence that, contrary to Moore's argument, Officer Helmer did know

Moore's approximate age. Specifically, he testified that he had previously heard the Willie Moore who was on the trespass list described as "a younger in the early 20's black male."[3] (Tr. 23).

[22] In light of these factors, we conclude that Officer Helmer's stop was based on specific facts giving rise to reasonable suspicion, not a hunch or unparticularized suspicion, and was thus lawful. As Moore does not otherwise challenge the arrest following his stop or the search producing the handgun, we also conclude that the trial court did not abuse its discretion on Fourth Amendment grounds when it admitted the evidence of the handgun discovered pursuant to the arrest.

### B. Article 1, Section 11

[23] Next, Moore argues that the stop was unlawful under the Indiana Constitution. Article 1, Section 11 of the Indiana Constitution, like the Fourth Amendment, prohibits unreasonable searches and seizures. However, although the language of Article 1, Section 11 is almost identical to the language of the Fourth Amendment, we interpret it and apply it independently from the Fourth Amendment. *Buckley v. State*, 886 N.E.2d 10, 14 (Ind. Ct. App. 2008). The legality of a governmental search under the Indiana Constitution turns on an

---

[3] It is apparent that this fit Moore's description as the trial court identified Moore's age as twenty-one when it sentenced him.

evaluation of the reasonableness of the police conduct under the totality of the circumstances. *Mundy v. State*, 21 N.E.3d 114, 118 (Ind. Ct. App. 2014).

[24] When evaluating the totality of the circumstances, we give Article 1, Section 11 a liberal construction in favor of protecting individuals from unreasonable intrusions on privacy. *Rush v. State*, 881 N.E.2d 46, 52 (Ind. Ct. App. 2008). Although there may be other relevant considerations under the circumstances, the reasonableness of a search or seizure turns on a balance of: (a) the degree of concern, suspicion, or knowledge that a violation has occurred; (b) the degree of intrusion the method of the search or seizure imposes on the citizens' ordinary activities; and (c) the extent of law enforcement needs. *Id.* The degree of intrusion is evaluated from the defendant's point of view. *Mundy*, 21 N.E.3d at 118. It is the State's burden to show that under the totality of the circumstances, its intrusion was reasonable. *Harper v. State*, 922 N.E.2d 75, 81 (Ind. Ct. App. 2010), *trans. denied.*

[25] Moore asserts that Officer Helmer's initial approach was arbitrary because the fact that Moore was wearing a hooded sweatshirt was not a reasonable basis for suspicion. Again, he also argues that, once Officer Helmer began talking to him, the officer should not have had a high degree of suspicion that he was involved in illegal activity because the officer knew there had been two Willie Moores on the property, and he did not know either Willie Moore's respective age, height, or weight.

[26] Considering the totality of the circumstances, we conclude that Officer Helmer's conduct was reasonable. As for his degree of suspicion that a violation had occurred, he initially noticed Moore because Moore was acting strangely by wearing a hoodie on a very hot day. While this alone would not necessarily generate a reasonable high degree of suspicion, Officer Helmer also discovered Moore's name and determined that there was a good chance that he was on Coppertree's trespass list. Contrary to Moore's arguments, and as we stated above, Officer Helmer did have a description of Moore's appearance and, therefore, could determine that Moore was likely the person on the trespass list. As for Officer Helmer's degree of intrusion, his intrusion was minimal as he merely took a moment to ask Moore questions in a public place. *See J.B. v. State*, 30 N.E.3d 51, 56 (Ind. Ct. App. 2015) (requiring a person to sit on the sidewalk for a "short time," without restraints, until other police officers arrived was a minimal intrusion). Finally, the extent of Officer Helmer's law enforcement need was high as he believed that Moore was on the apartment's trespass list and had caused several resident complaints. In light of Officer Helmer's high degree of suspicion, minimally intrusive actions, and law enforcement needs, we conclude that his investigatory stop of Moore was reasonable under the totality of the circumstances. Accordingly, the trial court did not abuse its discretion in admitting evidence of the handgun discovered pursuant to the search under the Indiana Constitution.

## 2. Serious Violent Felon

[27] Next, Moore argues that the trial court erred when it convicted him of unlawfully possessing a firearm as a serious violent felon based on its conclusion that his prior conviction in Illinois for residential burglary qualified him as a serious violent felon. In order to convict a defendant of unlawful possession of a firearm by a serious violent felon, the State must prove that the defendant has been convicted of a serious violent felony in Indiana or "any other jurisdiction in which the elements of the crime for which the conviction was entered are substantially similar to the elements of a serious violent felony." I.C. § 35-47-4-5(a)(1). The statute lists several offenses that qualify as serious violent felonies, including Levels 1, 2, 3, and 4 felony burglary. I.C. § 35-47-4-5(b)(15). The trial court concluded that the Illinois statute for residential burglary was substantially similar to the Indiana statute for burglary and, thus, concluded that Moore was a serious violent felon at the time of his offense. Moore challenges this conclusion, arguing that the Illinois statute was not substantially similar to the Indiana statute and that he should not have been considered a serious violent felon.

[28] To determine whether the statutes were substantially similar, we must compare the Illinois statute under which Moore was convicted and the Indiana statute at the time of the current offense. *Hollingsworth v. State*, 907 N.E.2d 1026, 1030 (Ind. Ct. App. 2009). We review questions of foreign law, as with any questions of law, de novo. *Id.* The Indiana Code does not define "substantially similar," but in *State v. Bazan*, No. 55A01-1506-CR-737, slip op. at *3 (Ind. Ct.

App. Nov. 10, 2015), we held that an out-of-state statute was not "substantially similar" to an Indiana statute when the out-of-state statute was broader than the Indiana statute. Specifically, we held that a New York statute for operating a vehicle while impaired was not substantially similar to Indiana's statute for operating a vehicle while intoxicated because the Indiana statute required a greater showing of impairment. *See id.* In contrast, where an out-of-state statute was more stringent than an equivalent Indiana statute, our supreme court held that the statutes were substantially similar. *See State v. Atkins*, 824 N.E.2d 676 (Ind. 2005) (holding that because Michigan's statute for operating a vehicle while being under the influence of an intoxicating liquor or having an alcohol content of 0.10 grams or more per 100 milliliters of blood required a degree of intoxication *greater* than Indiana's equivalent statute, the two statutes were substantially similar).

[29] The basis for Moore's argument is that the Indiana statute for burglary includes an element of "breaking," which requires force, whereas the Illinois statute for residential burglary does not. Specifically, in Indiana, a person commits Level 4 felony burglary if he or she "breaks and enters the building or structure of another person, with intent to commit a felony or theft in it" and the structure is a "dwelling."[4] I.C. § 35-43-2-1. The element of "break[ing]" requires the use of

---

[4] A burglary is a Level 5 felony if the building or structure is not a dwelling, but is a Level 4 felony if it is a dwelling. I.C. § 35-43-2-1. Because the Illinois residential burglary statute includes the "dwelling" element and because a burglary felony conviction must be a Level 4 felony or higher in Indiana in order to qualify as a serious violent felony, we will compare the elements for Level 4 felony burglary in Indiana and residential burglary in Illinois. 720 ILL. COMP. STATE. ANN. 5/19-3 (West 2015); I.C. § 35-47-4-5(b)(15).

force. *See Goolsby v. State*, 517 N.E.2d 54, 57 (Ind. 1987). At the time of Moore's residential burglary conviction, the Illinois residential burglary statute provided that a person committed residential burglary if he or she "knowingly and without authority enter[ed] or knowingly and without authority remain[ed] within the dwelling place of another, or any part thereof, with the intent to commit therein a felony or theft." 720 ILL. COMP. STATE. ANN. 5/19-3 (West 2013). Based on the difference in wording between these two statutes, Moore asserts that a person may be convicted of residential burglary in Illinois without being convicted of burglary in Indiana under the same circumstances, which under *Bazan* would indicate that the two statutes are not substantially similar.

[30] We disagree with Moore's argument that Illinois' residential burglary statute was not substantially similar to the Indiana burglary statute because it did not include the word "breaking," or explicitly require the use of force. To the contrary, Illinois legal authority indicates that the Illinois residential burglary statute implies the use of force, like the burglary statute in Indiana. In *People v. Beauchamp*, 944 N.E.2d 319, 323 (Ill. 2011), the Illinois Supreme Court interpreted the element "enter" of the burglary statute to include a "breaking." Specifically, the Court stated that "an entry may be accomplished simply by 'breaking the close,' *i.e.* crossing the planes that enclose the protected space." *Id.* In other words, an "entry" involves force, even if it is the slightest force. Notably, in Indiana, the use of force may also be slight and still constitute a "breaking." *See Smith v. State*, 535 N.E.2d 117, 118 (Ind. 1989) ("The use of even the slightest force, such as the opening of an unlocked door, can constitute

a breaking."). Therefore, the word "entry" in Illinois had a similar meaning to "breaking" in Indiana.

[31] In addition, at the time of Moore's Illinois offense, residential burglary was classified as a "forcible felony" under the Illinois Criminal Code. 720 ILL. COMP. STATE. ANN. 5/2-8 (West 2013). According to the Criminal Code, a "forcible felony" was:

> treason, first degree murder, second degree murder, predatory criminal sexual assault of a child, aggravated criminal sexual assault, criminal sexual assault, robbery, burglary, *residential burglary*, aggravated arson, arson, aggravated kidnaping, kidnaping, aggravated battery resulting in great bodily harm or permanent disability or disfigurement and *any other felony which involves the use or threat of physical force or violence against an individual*.

*Id.* (emphasis added). Although the classification of "forcible felony" is primarily relevant in the context of felony murder in Illinois, we find it significant that the Illinois legislature found residential burglary comparable to a felony involving "the use or threat of physical force or violence." *Id.*

[32] In light of the above factors, we do not find merit in Moore's argument that the Illinois statute for residential burglary was not substantially similar to the Indiana statute for burglary merely because it did not include the term "breaking." Instead, we conclude that the Illinois statute implies the use of force, which is substantially similar to the Indiana burglary statute. We do not find any error in the trial court's conclusions on this issue.

### 3. Resisting Law Enforcement

[33]  Finally, Moore argues that there was insufficient evidence to support his conviction for resisting law enforcement as a Level 6 felony. A person commits resisting law enforcement as a Class A misdemeanor if he or she: "knowingly or intentionally . . . flees from a law enforcement officer after the officer has, by visible or audible means, including the operation of the law enforcement officer's siren or emergency lights, identified himself or herself and ordered the person to stop." I.C. § 35-44.1-3-1(a)(3). The offense is elevated to a Level 6 felony if, while committing the offense, "the person . . . inflicts bodily injury on or otherwise causes bodily injury to another person[.]" I.C. § 35-44.1-3-1(b)(1)(B). Moore was convicted of a Level 6 felony because Officer Helmer fell while he was pursuing Moore and suffered a partially-torn tendon in his left shoulder. On appeal, Moore argues that evidence of this injury was not sufficient to support the elevation of his conviction to a Level 6 felony because there was no evidence that he "inflict[ed]" or "otherwise cause[d]" the officer's bodily injury. I.C. § 35-44.1-3-1(b)(1)(B).

[34]  The standard of review for a sufficiency of the evidence claim is that this Court should only reverse a conviction when reasonable persons would not be able to form inferences as to each material element of the offense. *Perez v. State*, 872 N.E.2d 208, 212-13 (Ind. Ct. App. 2007), *trans. denied.* We do not reweigh evidence or judge the credibility of witnesses. *Id.* at 213. In addition, we only consider the evidence most favorable to the judgment and the reasonable inferences stemming from that evidence. *Id.*

[35]     Moore and the State direct us to two cases regarding causation of bodily injury while resisting arrest: *Whaley v. State*, 843 N.E.2d 1 (Ind. Ct. App. 2006), *trans. denied*, and *Smith v. State*, 21 N.E.3d 121 (Ind. Ct. App. 2014). In *Whaley*, the defendant, Whaley, attempted to prevent police officers from handcuffing him when he was lying on the ground by placing his arms underneath his body. *Whaley*, 843 N.E.2d at 5. Two officers had to hit his forearms in order to bring his arms behind his back to handcuff him, and both officers injured their wrists and hands in the process. *Id.* Because Whaley had caused these injuries, his conviction for resisting law enforcement was elevated to a Class D felony.[5] *See id.* at 10. At trial and on appeal, Whaley argued that his conviction should not have been elevated to a Class D felony because the officers themselves caused their injuries when they hit him. *Id.* We upheld Whaley's conviction, concluding that the officers' injuries "were directly related to and caused by Whaley's resisting arrest." *Id.* at 11.

[36]     In *Smith*, the defendant, Smith, also resisted being handcuffed. *Smith*, 21 N.E.3d at 123. As a result, an officer "forcefully put all [his] body weight onto [Smith's] body[.]" *Id.* The officer told Smith to put her hands behind her back or he would "take [her] to the ground," but she still did not comply. *Id.* The

---

[5] Effective July 1, 2014, the Indiana Legislature amended the resisting law enforcement statute based on a revised sentencing scheme. An elevation from a Class A misdemeanor for "caus[ing]" bodily injury was previously considered a Class D felony but is now a Level 6 felony. *See* I.C. § 35-44.1-3-1 (2013); I.C. § 24-44.1-3-1 (2014). Although the classification of the felony changed, the elements of the offense did not. Accordingly, even though Whaley was sentenced to a Class D felony, his argument still applies here because the elements for the former Class D felony conviction are equivalent to the elements for a Level 6 felony conviction.

officer then tried to give Smith a "knee strike" by "apply[ing] some pain to . . . a nerve that [ran] to the muscle of [her] leg," but that did not have the desired effect, so the officer "pulled her arm . . . possibly as hard as [he] could [and] [they] ended up on the ground." *Id.* In this process, the officer received lacerations to his knuckles and fingertips. *Id.* As a result, Smith was charged with, and convicted of, resisting arrest as an elevated Class D felony based on the officer's injuries. *Id.* at 124.

[37] On appeal, Smith argued that she did not cause the officer's injuries and that her conviction should not have been enhanced to a felony. We agreed with Smith that she was a "passive part of the encounter" and "took no actions toward" the officer. *Id.* at 125. We also stated that we did not "believe a person who is thrown to the ground necessarily 'inflicts' or 'causes' an injury suffered by the person who throws her to the ground." *Id.* As a result, we concluded that Smith did not cause the officer's injuries and that her conviction should not have been elevated to a felony. *Id.* at 126. We distinguished this conclusion from our decision in *Whaley* by noting that "unlike Whaley, Smith did not create a scenario in which [the officer's] only option in handcuffing her was to remove her hands from a location in which he could not reach." *Id.*

[38] Another way to distinguish these two cases is by considering the difference between contributing and proximate causation, which is a distinction that our supreme court discussed in *Abney v. State*, 766 N.E.2d 1175 (Ind. 2002). There, our supreme court defined a "contributing cause" as "a factor that-though not the primary cause-plays a part in producing a result." *Id.* at 1178. As an

example of a contributing cause, the Court noted a hypothetical it had used in its decision in *Micinski v. State*, 487 N.E.2d 150, 154 (Ind. 1986), of a drunk driver who hit a child that had run out from between two parked cars. *Id.* at 1177. The Court used this example to demonstrate that a contributing cause should not be sufficient causation for purposes of criminal liability. Specifically, it quoted its statement from *Micinski* that the driver who had hit the child would be a contributing cause of the child's injuries or death, but might be "entitled to ask the jury to find him not guilty because there is a reasonable doubt whether he *caused* the collision." *Id.* (emphasis added).

[39] Instead of a contributing cause, the *Abney* Court held that, to support a conviction based on an injury or death, the State must prove that a defendant is a proximate cause of the victim's injury or death. *Id.* at 1178. Specifically, the Court stated that, in the context of a conviction for operating a vehicle with at least ten-hundredths percent by weight of alcohol in a person's blood and causing death, "[i]f the driver's conduct causes the injury, he commits the crime; if someone else's conduct caused the injury, he is not guilty." *Id.* at 1177. It reasoned that this was "simply a short-handed way of stating the well-settled rule that the State must prove [a] defendant's conduct [is] a proximate cause of the victim's injury or death." *Id.* at 1177-78.

[40] In *Gibbs v. State*, 677 N.E.2d 1106 (Ind. Ct. App. 1997), we described the requirements for proximate cause. There, we stated:

> A finding of proximate cause embodies a value judgment as to
> the extent of the physical consequences of an action for which the

actor should be held responsible. Accordingly, "proximate cause questions are often couched in terms of 'foreseeability;' an actor is not held responsible for consequences which are unforeseeable." It follows that, where an intervening cause is claimed as superseding the defendant's actions, the intervening cause is claimed as superseding the defendant's actions, the intervening cause must be unforeseeable to relieve the defendant of criminal liability.

*Id.* at 1109.

[41] Although *Abney* concerned a conviction for operating while intoxicated causing death, it is a well-settled rule, as the *Abney* Court stated, that causation for purposes of a criminal conviction must be proximate, rather than contributing. *See id.* Troublingly, the *Whaley* and *Smith* Courts did not couch their decisions in terms of this standard for causation. However, we may interpret their decisions consistently with this standard. As we noted in *Smith*, in *Whaley*, Whaley did not give the officers any choice but to hit his arms to move them, whereas in *Smith*, Smith "did not create a scenario in which [the officer's] only option in handcuffing her was to remove her hands from a location in which he could not reach." *See Smith*, 21 N.E.3d at 126. In other words, in *Whaley*, Whaley was the direct cause of the officers' injuries because he left the officers no other choice but to hit his arms. In terms of proximate cause, this meant that the officers' injuries were a highly foreseeable result of Whaley's actions. In contrast, in *Smith*, the officer had other options, and his decision to take Smith "to the ground" and injure himself was not as foreseeable. Therefore, although the *Smith* Court did not frame its decision in terms of proximate

cause, we interpret the *Smith* Court's holding to imply that Smith's actions were not a proximate cause of the officer's injuries.

[42] Using the standard of proximate cause here, we are not convinced that the evidence of Moore's actions was sufficient to support the conclusion that he caused Officer Helmer's injuries. While Officer Helmer would not have received his injury if he had not pursued Moore, that fact is only sufficient to prove that Moore was a contributing cause of the injury—i.e., "a factor that-though not the primary cause-plays a part in producing a result." *Abney*, 766 N.E.2d at 1178. The actual cause of Officer Helmer's fall is not clear from the record. While it may be possible for a defendant fleeing from an officer to be a proximate, as well as contributing, cause of that officer's resulting injuries, we do not find evidence to support that Moore proximately caused Officer Helmer's injuries here. In addition to the fact that there was no evidence of the actual cause of Officer Helmer's fall, Moore, unlike *Whaley*, did not put Officer Helmer in a position where his only option was to suffer injury.

[43] However, although we find that there was not sufficient evidence to support the causation element that enhanced Moore's conviction for resisting law enforcement to a Level 6 felony, it is undisputed that there was sufficient evidence to convict him of resisting law enforcement as a Class A misdemeanor. Accordingly, we reverse Moore's resisting law enforcement conviction and remand to the trial court with instructions to vacate Moore's conviction and re-enter a conviction and sentence for Class A misdemeanor resisting law enforcement. *See Chatham v. State*, 845 N.E.2d 203, 208 (Ind. Ct.

App. 2006) ("When a conviction is reversed because of insufficient evidence, we may remand for the trial court to enter a judgment of conviction upon a lesser-included offense if the evidence is sufficient to support the lesser offense.")

[44] Affirmed in part, reversed in part, and remanded.

Baker, J., concurs.

Bradford, J., concurs in part, dissents in part with opinion.

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Willie Moore, | January 29, 2016 |
| *Appellant-Defendant,* | Court of Appeals Case No. 49A02-1505-CR-321 |
| v. | Appeal from the Marion Superior Court |
| State of Indiana, | The Honorable Peggy Hart, Commissioner |
| *Appellee-Plaintiff.* | Trial Court Cause No. 49G20-1407-F5-35217 |

**Bradford, Judge.**

Bradford, Judge, concurring in part, dissenting in part.

I concur with the majority's conclusion that the trial court acted within its discretion in admitting the handgun discovered on Moore's person into evidence. I also concur with the majority's conclusion that the Illinois statute for residential burglary was substantially similar to the Indiana burglary statute. However, because I believe that the evidence was such that the trial court, acting as the trier-of-fact, could reasonably conclude that Moore's actions were the proximate cause of Officer Helmer's injury, I respectfully dissent from the majority's conclusion that the evidence was insufficient to sustain Moore's conviction for Level 6 felony resisting arrest.

Indiana Code section 35-44.1-3-1(b)(1)(B) provides that the offense of resisting law enforcement is a Level 6 felony if while committing the offense, the person "inflicts bodily injury on *or otherwise causes* bodily injury to another person." (Emphasis added). In order to support a conviction based on injury to another, the State must prove that a defendant's actions were the proximate cause of the victim's injury. *See generally, Abney v. State*, 766 N.E.2d 1175, 1177-78 (Ind. 2002) (providing that it is well-settled that the State must prove that the defendant's conduct was the proximate cause of the victim's injury or death). A determination as to whether an act was the proximate cause of the injury to the victim is generally a question of fact. *See Hellums v. Raber*, 853 N.E.2d 143, 146 (Ind. Ct. App. 2006). At a minimum, proximate cause requires that the injury would not have occurred "but for" the defendant's conduct. *Paragon Family Rest. v. Bartolini*, 799 N.E.2d 1048, 1054 (Ind. 2003).[6]

---

[6] In concluding that the evidence is insufficient to sustain the enhanced felony conviction, the majority cites to this court's decision in *Smith v. State*, 21 N.E.3d 121 (2014). In *Smith*, a panel of this court concluded that the evidence was insufficient to sustain the enhanced felony conviction because the Officer was injured as a result of his decisions rather than Smith's actions, which the court deemed were a "passive part of the encounter." 21 N.E.3d at 125. The majority interprets the *Smith* Court's holding to imply that Smith's actions were not a proximate cause of the Officer's injuries. I respectfully disagree with the conclusion in *Smith* that the Officer's injuries were not proximately caused by Smith's actions. Furthermore, as with the instant case, I feel that the determination of proximate cause in *Smith* is one which should be left to the fact-finder.

In the instant matter, the evidence demonstrates that Moore resisted law enforcement by running away after being stopped by Officer Helmer. Officer Helmer was injured when he fell while chasing after Moore. The evidence is such that the trial court, acting as the trier-of-fact, could reasonably form the inference that Moore's act of running from Officer Helmer was the proximate cause of Officer Helmer's injury. In addition, it is not unreasonable to anticipate that a consequence of fleeing from the police would be that an officer could fall and be injured during the ensuing chase. I would therefore conclude that the evidence is sufficient to prove that Moore "caused" Officer Helmer's injury and affirm Moore's conviction for Level 6 felony resisting law enforcement.